IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

AMERICA AERO GROUP, LLC            CASE NO. 23cv01861

      Plaintiff,

v.

ZURICH AMERICAN INSURANCE COMPANY,

      Defendant.

_____/

## COMPLAINT FOR DECLARATORY JUDGMENT AND DAMAGES

Comes now, Plaintiff America Aero Group, LLC ("AAG"), by and through its undersigned counsel, and hereby brings a claim for damages against Zurich American Insurance Company ("Zurich") and as grounds thereof asserts as follows:

### PARTIES, JURISDICTION, AND VENUE

1. This is an action for declaratory relief pursuant to 28 United States Code Section 2201.

2. Moreover, this Court has jurisdiction under 28 United States Code Section 1332 in that this is an action between citizens of different states as well as that the amount in controversy exceeds $75,000 exclusive of attorneys' fees, interest, and costs.

3. Plaintiff America Aero Group, LLC is a Florida limited liability company. Therefore, for purposes of diversity of citizenship, the Court must look to the citizenship of the members of Plaintiff. All members of Plaintiff are citizens of the State of Florida. Hence, for purposes of diversity of citizenship, Plaintiff is a citizen of Florida.

4. Defendant Zurich American Insurance Company is a New York for-profit corporation with its principal place of business in Cook County, Illinois. Therefore, Zurich is

deemed to be a citizen of both New York and Illinois for purposes of determining diversity of citizenship.

5. This Court has personal jurisdiction over Defendant Zurich insofar as Defendant Zurich's principal place of business is located in this district. Moreover, this Court has personal jurisdiction over Defendant Zurich under 735 Illinois Compiled Statutes Section 5/2-209 insofar as Defendant Zurich transacted business from Cook County, Illinois.

6. Venue is proper in this district under 28 U.S.C. Section 1391 in that Defendant Zurich's principal place of business is located in this district.

7. This action is brought pursuant to 28 U.S.C. § 2201(a), which provides that the Court may declare the rights and other legal relations of the parties under certain contracts between them. AAG and Zurich are parties having an interest in the Policy referenced herein.

8. AAG Seeks a declaration of rights, status, and legal relations between it and Defendant Zurich under the insurance contract described herein. More specifically, AAG seeks a declaration that Defendant Zurich wrongfully denied coverage to AAG and for damages resulting therefrom.

## BRIEF BACKGROUND – THE ASSIGNMENT

9. Effective April 15, 2019, Zurich issued the Zurich EDGE Global Policy, policy number PPR0193512-03 (the "Policy"), to VAS Aero Services, LLC ("VAS"). A true and correct copy of the Policy is attached hereto as **Exhibit A**.

10. On July 20 2022, VAS and AAG executed an assignment of claims whereby VAS transferred to AAG "any and all rights, claims, actions, causes of actions, and/or benefits, whether in tort (including, without limitation, VAS Aero's bad faith rights), contract, or otherwise, that

[2386373/1] 2

VAS Aero has or may come to have under applicable law against [Zurich]" (the "Assignment"). A true and correct copy of the Assignment is attached hereto as **Exhibit B**.

11. AAG now brings this action pursuant to such Assignment.

### **BRIEF BACKGROUND – VAS AERO SERVICES, LLC**

12. VAS is a leading supplier of aviation parts to the global aircraft industry.

13. VAS operates a number of locations throughout the globe, including through two main sites in the United States—a principal place of business in Boca Raton, Florida, and a key distribution facility located in Kent, Washington, close to Boeing's worldwide headquarters.

14. In addition, VAS operates a distribution facility at London-Heathrow airport through which it can supply its clients throughout Europe.

15. Further, VAS has arrangements with third-party providers whereby VAS maintains aviation parts in both Tarbes, France, and Zurich, Switzerland.

16. To provide 24-hour coverage, VAS has sales/marketing presences in the additional following locations: Phoenix, Arizona; Dublin, Ireland; Tel Aviv, Israel; Singapore, Singapore; Shanghai, China; and Adelaide, Australia.

17. In order to be able to supply parts to the aviation industry as they are needed, VAS maintains a 24/7 Aircraft on Ground ("AOG") service to ship aviation parts wherever in the world that they are needed.

18. The nature of the aviation industry is such that, regardless of the pandemic, many of the parts are time-limited, and the aviation industry continued to require parts regardless of whether there was a demand for air travel services or commercial passenger flights were grounded.

**BRIEF INTRODUCTION – THE PANDEMIC**

19. By this point, the Court is well acquainted with the realities that were present during the global COVID-19 pandemic.

20. However, VAS was in a unique position as a result of the pandemic.

21. As noted above, VAS supplied aviation parts that continued to have a robust demand during the pandemic, and narrow body aircraft continued operations, as airlines were keeping their fleets up and ready for the day that commercial air travel returned to a full operating schedule.

22. But, more crucially, due to the sudden growth of the commercial cargo industry, VAS was facing more demand than ever for the aviation parts that it offered.

23. That said, because VAS employees was physically restricted from accessing its time-limited parts, VAS faced a year-over-year decline in sales of **72%** from 2019 to 2020.

24. As noted above, VAS is co-located with British Airways in London and with Boeing in Washington. So, when lockdowns in those locales prevented employees from being able to come to work, VAS's employees were barred from accessing VAS's physical supply of goods.

25. Attached hereto as **Composite Exhibit C** are true and correct copies of the Proclamation by the Governor Jay Inslee of the State of Washington issued in February 2020 and March 2020, under which VAS lost access to its inventory in Washington.

26. Furthermore, in Boca Raton, Florida, VAS lost weeks of access to its inventory as it appealed to Florida Governor Ron DeSantis to be deemed an essential business so that VAS could continue its Florida operations and access its time-limited part inventory.

27. Attached hereto as **Exhibit D** is a true and correct copy of the Order from the City of Boca Raton, dated March 24, 2020, under which VAS lost access to its inventory in Boca Raton.

28. Attached hereto as **Exhibit E** is a true and correct copy of the Orders from the State of Florida, dated March 2020 through April 2020, under which VAS lost access to its inventory in Boca Raton.

29. Attached hereto as **Exhibit F** is a true and correct copy of Gov.UK guidance regarding the stay at home orders in place in the United Kingdom beginning March 23, 2020, under which VAS lost access to its inventory in London.

30. While many companies sat on their hands in the initial days of the COVID-19 Stay at Home closures, VAS, recognizing its role in supporting the airline industry, left no stone unturned in its attempts to immediately re-gain access to its inventory to provide uninterrupted service to its customers.

31. This included phone calls, letters, and emails to local, state, and federal officials in Boca Raton, Florida; Kent, Washington; and London, United Kingdom, attempting to be classified as an essential business for purposes of allowing VAS employees to re-gain access to the time-sensitive parts and equipment of VAS.

32. However, despite VAS's best efforts, VAS lost access to its time-sensitive inventory for—in some cases—weeks, resulting in the "spoilage" of the time-sensitive aircraft parts, rendering them worthless.

33. Luckily, or so AAG thought, VAS had purchased the Policy from Zurich. For this Policy, VAS had paid $247,000 for $30,000,000 in coverage.

**BRIEF INTRODUCTION – THE POLICY**

34. Effective April 15, 2019, Zurich issued the Policy to VAS. But, crucially, Policy was not the first that VAS purchased from Zurich—having paid Zurich approximately $1 million *since 2015* with minimal to no claims submitted to Zurich.

35. So, with VAS's operations at a standstill, AAG turned to Zurich—its insurer—assuming that Zurich would treat AAG with good faith. However, that could not have been further from the truth.

36. Indeed, in the first sentence of the denial letter, a true and correct copy of which is attached hereto as **Exhibit G**, Zurich stated that "There has been exposure of COVID-19 to employees and presumed COVID-19 at the airport locations where America Aero Group operates."

37. Neither VAS nor AAG had reported no such cases to Zurich, nor were there any such "contamination" claims documented at any of VAS's locations—in fact, even the Centers for Disease Control and Prevention have written that COVID can live for only a few hours without a host.

38. Under the Policy, the following coverage exists:

> The Company will pay for the actual Time Element loss the Insured sustains, as provided in the Time Element Coverages, during the Period of Liability. The Time Element loss must result from the necessary **Suspension** of the Insured's business activities at an Insured Location. The **Suspension** must be due to direct physical loss of or damage to Property (of the type insurable under this Policy other than **Finished Stock**) caused by a Covered Cause of Loss at the Location, or as provided in Off Premises Storage for Property Under Construction Coverages.

> The Company will also pay for the actual Time Element loss sustained by the Insured, during the Period of Liability at other Insured Locations. The Time Element loss must result from the necessary **Suspension** of the Insured's business activities at the other Insured Locations. Such other Location must depend on the continuation of business activities at the Location that sustained direct physical loss or damage caused by a **Covered Cause of Loss**.

Exh. A at 27.

39. Indeed, the Policy Limits provide for **$30,000,000** in coverage under the Time Element provision. Exh. A at 10. Yet, Zurich did not even consider the claim in good faith, instead just issuing the same form denials that it was sending to all businesses that were having changes to their operations.

40. But, there is a huge difference between an aviation services business which cannot access its inventory **at all** and a restaurant that has to switch to takeout and delivery, to be frank. This is especially true since airlines continued operating.

41. Zurich, however, failed to appreciate the distinction or even consider AAG's claim in good faith.

42. Zurich went straight to claiming that COVID-19 did not cause damage to VAS's property, and, even if it had, it would have been in the air, so it was a contamination. Courts have routinely rejected this absurd position that COVID-19 constituted contamination.

43. But, where Zurich fundamentally erred was that because VAS's employees were physically restricted from accessing VAS's time-limited property, *there was a property loss*. Indeed, many courts considering this same language have found that a physical restriction on the access to property itself may constitute a loss under language similar and identical to the language in the Policy that Zurich issued. However, Zurich simply failed to consider the full claim that was before it.

44. In addition to the Time Element loss coverage provided at Part IV, the Policy contains the following provision:

> The Company will pay for the actual Time Element loss sustained by the Insured, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** is caused by order of

> civil or military authority that prohibits access to the **Location**. That order must result from a civil authority's response to direct physical loss of or damage caused by a **Covered Cause of Loss** to property not owned, occupied, leased or rented by the Insured or insured under this Policy and located within the distance of the Insured's Location as stated in the Declarations. The Company will pay for the actual Time Element loss sustained, subject to the deductible provisions that would have applied had the physical loss or damage occurred at the Insured Location, during the time the order remains in effect, but not to exceed the number of consecutive days following such order as stated in the Declarations up to the limit applying to this Coverage.

Exh. A at 34–35.

45. Indeed, Zurich's reading of the Civil Authority coverage would render this provision fully superfluous, as it would never actually provide AAH with the coverage that it was promised and for which VAS paid Zurich handsomely.

46. Zurich's reading is that these provisions are there to cover a business, for instance, when there is a fire next door and the fire marshal closes their business down while the property is inspected to ensure that everything is okay. The Loss that is taking place is the physical deprivation of the property to the insured.

47. Zurich's reading here is that AAG is not covered for this loss because it is more analogous that here the County health director showed up and said that the airports were contaminated, and, therefore, VAS could not access its property.

48. However, the reality is that AAG's situation was much closer to the first than to the second. There was no such contamination; however, VAS and its employees were told that they could not access its property until the civil authority deemed that VAS was an essential business.

49. Again, unlike the restaurant that could not seat customers *in the restaurant*, VAS could not access its time-limited inventory. It was not that VAS could access its inventory and deliver its parts—VAS would have gladly done that. No, this was an instance where the sheer deprivation from the time-limited parts not only deprived VAS of those sales but also eroded the

value of the inventory itself. Like the restaurant example that has been well-worn here, AAG's claim would be analogous to a restaurant business where the restaurateurs were denied access to the property and the perishables spoiled in the interim.

50. Surely, this would constitute a physical loss, as the perishables—here, the time-limited parts—spoiled in the process.

51. Moreover, the Policy claims that it has coverage for "Extra Expense" (Exh. A at 29) but Zurich never proceeded to make those considerations, having failed at step 1 by deeming that the pandemic was a contamination.

### THE DISPUTE

52. Zurich denies coverage to VAS, whose claim is now held by AAG.

53. AAG claims that Zurich's coverage denial is incorrect.

54. Therefore, there is a real dispute between the parties for which a legal determination is required.

55. AAG asks the Court to declare that Zurich is incorrectly reading its own policy to deny coverage to AAG. AAG also asks the Court, if it concludes that AAG is correct, to award AAG its damages for Zurich's breach of the insurance contract.

56. There is a bona fide present dispute between AAG and Zurich regarding whether AAG is entitled to coverage for its losses taking place when VAS was deprived of its access to its physical inventory and could not fulfill its customers' orders.

57. AAG has otherwise complied with all conditions precedent to suit.

58. AAG has retained counsel for this suit, for which AAG must provide compensation.

## COUNT I
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201

AAG repeats and re-alleges each and every allegation contained in paragraphs 1 through 58 above, as if the same were fully alleged herein and states further:

59. VAS had its access to its property restricted under multiple government orders. This constitutes a physical loss of its property—even if temporary.

60. Unlike other insureds making this claim, VAS was denied access to its time-limited inventory, which resulted in spoilage as a result.

61. Therefore, Zurich was incorrect in determining that there was not a predicate physical loss to trigger coverage.

62. Moreover, Zurich was incorrect in seeking to apply the contamination exclusion.

63. Through the Assignment, AAG has the right to bring this cause of action for declaratory relief under 28 U.S.C. § 2201. Exh. B.

64. Hence, AAG is entitled to a declaratory judgment in its favor, stating that Zurich owes it coverage for its losses stemming from VAS's inability to access its physical property.

WHEREFORE, Plaintiff America Aero Group, LLC, respectfully requests that this Court declare the rights of the parties and declare that AAG was entitled to coverage under the Policy and for such other relief as the Court may deem just and proper.

## COUNT II
### BREACH OF CONTRACT

AAG repeats and re-alleges each and every allegation contained in paragraphs 1 through 58 above, as if the same were fully alleged herein and states further:

65. The Policy constitutes the contract between Zurich and VAS.

66. Through the Assignment, AAG has the right to sue Zurich for the breach of the insurance contract with VAS. Exh. B.

67. AAG performed its obligations under the Policy when it timely submitted the claim to Zurich.

68. Because Zurich owed coverage to AAG and denied AAG coverage, Zurich breached the Policy.

69. AAG has been proximately damaged as a result of the breach, including that AAG had to secure legal representation to challenge the wrongful denial by Zurich.

WHEREFORE, Plaintiff America Aero Group, LLC, respectfully requests that this Court enter judgment in favor of AAG against Zurich American Insurance Company for breach of contract, award AAG its damages flowing therefrom, including its reasonable attorneys' fees and costs for having to bring this action and for pre- and post-judgment interest, for punitive damages for Zurich's wrongful denial, and for such other relief as the Court may deem just and proper.

## JURY TRIAL REQUEST

Plaintiff respectfully request a jury trial on all issues so triable.

Respectfully submitted this 24th day of March, 2023.

**ZEBERSKY PAYNE SHAW LEWENZ, LLP**
110 S.E. 6th Street, Suite 2900
Fort Lauderdale, FL 33301
Telephone: (954) 595-6060
Facsimile: (954) 989-7781

 *Zachary D. Ludens*
ZACHARY D. LUDENS, ESQ.
Florida Bar No. 111620
zludens@zpllp.com
JORDAN A. SHAW, ESQ. (PHV forthcoming)
Florida Bar No. 111771
jshaw@zpllp.com